Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission upon reconsideration of the evidence modifies and affirms the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties in their Pre-Trial Agreement filed on 30 November 1999, and at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The Industrial Commission has jurisdiction over the subject matter of this case, the parties are properly before the Commission, and the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act at all relevant times.
2. Defendant was a duly qualified self-insured, with The Phoenix Fund (National Benefits America, Inc.), as the servicing agent.
3. The employee-employer relationship existed between the parties at all relevant times.
4. Plaintiff's average weekly wage was $704.55, which yields a compensation rate of $469.72 per week.
5. The parties stipulated medical reports into the record:
 a. Stipulated Exhibit 1, forty-seven pages of medical reports from Carolina Bone Joint Clinic, P.A.,
 b. I.C. Form 18, filed 11 May 1999, I.C. Form 33, filed 11 May 1999, I.C. Form 19, dated 17 May 1999, and I.C. Form 33R, filed 16 August 1999.
 c. Stipulated Exhibit 2, Notice of Claim and Request for Separation.
 *********** EVIDENTIARY RULING
The stipulated Industrial Commission Forms listed in Stipulation 5(b) which were omitted from the record are hereby included. also defendant's objection to the inclusion of plaintiff's Exhibits 1, 2, and 3 in the record during the deposition of Dr. Friedrich is overruled.
 ***********
Based upon all of the competent evidence adduced from the record and the reasonable inferences therefrom, the Full Commission enters the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was a 61 year old married male, with a sixth-grade education. He began his employment with defendant in October 1981, core drilling and sawing concrete. Plaintiff was initially hired as a helper; and after approximately five to eight years, he was promoted to foreman.
2. Plaintiff's work consisted of two tasks: (1) floor sawing; and (2) core drilling. Approximately, 75% of plaintiff's responsibilities involved core drilling, and the remaining 25% were floor sawing. Plaintiff primarily worked as part of a two member crew where he was the working supervisor. Plaintiff worked at various job sites and would stay at each site until the job was completed. Some jobs lasted several weeks and some less than a day. Plaintiff would drive to the job sites.
3. Plaintiff used self-propelled saws for the floor-sawing job, the smaller of which weighed approximately 250 pounds. Once unloaded at a job site, plaintiff and his assistant manually pushed the saws to the location of the cut; however, when access to the job involved going up and down stairs, plaintiff and his assistant carried the saws up as many as 10 flights of stairs. The saws were raised and lowered hydraulically and once set to begin cutting, required only guidance along the cut line by the operator. Plaintiff used floor saws to cut large areas of concrete into manageable slabs three to four feet square. Once sawing was completed, most of the concrete was removed by a tractor that would scoop up the pieces and haul them off. Where the nature of the job site prohibited access of a tractor, the cut slabs would be tilted up by means of a crowbar, lifted from the floor bed and manually moved to a dolly for removal by plaintiff and his assistant. Plaintiff was involved in the manual removal of concrete on approximately two or three job sites a week.
4. Core drilling is a process by which channels are created in concrete or asphalt to accommodate wiring, plumbing pipes, etc. The drill used for core drilling consisted of a stand which was anchored to the floor or wall, and a drill motor which fit on the stand and ran on a track. The two pieces together weighed 118 pounds and were manually carried by plaintiff and his assistant to the job location which frequently involved going up and down stairs. In addition to the drill, plaintiff had to carry a five gallon bucket of tools weighing approximately fifty pounds to the job site. Plaintiff used a standard drill which was 42 inches high, and the core drilling process involved setting an anchor that stood approximately 30 inches above floor level. To set an anchor plaintiff was required to squat or kneel on the floor and make a hole with a rotary hammer. He would then squat or kneel to drive the anchor into the floor with a hammer. The stand was thereafter placed on the anchors and bolted down. Once the stand was anchored, plaintiff would place the 75 pound electric motor on the stand, which also involved squatting and lifting the motor from the floor to the stand. In cases where the hole was to be drilled in a wall, plaintiff had to lift and carry the drill up a ladder for anchoring. Once the drill was set up, plaintiff only needed to use minimal physical exertion. The average hole took 10 to 15 minutes to drill. Plaintiff was allowed to sit or stand while drilling. Plaintiff frequently chose to sit down on his tool bucket during the process.
5. Plaintiff worked five to seven days per week. An average workday would involve two to three jobs at different locations to which the employees would travel. Each change in location involved breaking down the saw and drill equipment, then setting it up again. Plaintiff was allowed to take breaks as needed, but mostly he worked without breaks until the job was completed.
6. For several years prior to 2 July 1997, plaintiff had begun to experience increasing soreness and pain in his knees. He eventually sought medical attention from Dr. William Gruhn at Carolina Bone Joint in June 1997 and was referred to orthopedic surgeon Dr. Thomas Friedrich.
7. On 2 July 1997, Dr. Friedrich examined plaintiff, and following x-rays, he diagnosed plaintiff with end-stage osteoarthritis in both knees and genu-verum (bowlegged) deformity. Osteoarthritis does not in itself require surgical intervention. Rather, it is the pain associated with the condition that may eventually necessitate surgery.
8. Dr. Friedrich recommended bilateral knee replacements because of plaintiff's continued pain and his age. Dr. Friedrich performed a total knee arthroplasty on plaintiff's right knee on 21 July 1997. A total arthroplasty was performed on plaintiff's left knee on 10 November 1997. The operation consisted in part of replacing approximately half of the knee cap with plastic. The operation will need to be repeated in 15 to 20 years due to normal wear on the plastic. On 19 June 1998, Dr. Friedrich performed an arthroscopic exploration and biopsy of plaintiff's left knee. On 16 April 1998, Dr. Friedrich opined that plaintiff had reached maximum medical improvement and assigned a 40% permanent partial impairment to plaintiff's right leg and a 50% permanent partial impairment rating to plaintiff's left leg.
9. On 6 October 1997, Dr. Friedrich opined that there might be some type of genetic predisposition to plaintiff's genu-verum and the medial overload of his knee which caused the osteoarthritis.
10. Plaintiff went on vacation beginning on 4 July 1997 and when he was unable to return to work for defendant after vacation because of knee problems, he was discharged as of 10 July 1997 due to his "inability to perform the available work." Plaintiff was scheduled to have surgery in the following weeks. Plaintiff reported these plans to defendant-employer. On 6 October 1997, plaintiff asked Dr. Friedrich whether his condition might be due to his employment, and Dr. Friedrich told plaintiff that it would be difficult to prove causation. Under those circumstances, it was reasonable for plaintiff to rely on that information and not pursue a compensation claim for his knee replacement surgeries at that time.
11. In a letter dated 12 May 1999, Dr. Friedrich notified plaintiff for the first time that his knee condition may have been aggravated or accelerated by his employment with defendant. This was the first time period in which plaintiff was notified by competent medical authority that his disabling knee condition may have been work related; however, Dr. Friedrich further opined in his 12 May and 21 May 1999 letters that plaintiff's work did not cause or contribute to the development of his osteoarthritis.
12. Plaintiff filed a claim on 11 May 1999 alleging that his knee condition was caused by repetitive stress on his knees due to his job duties with defendant. At the time plaintiff filed his claim he had requested information from Dr. Friedrich about presumably the work-relatedness of his knee condition, but had received no response. Defendant contends that plaintiff's claim was not timely filed.
13. When plaintiff filed the Form 18 Notice of Accident, he reported the date of onset of the alleged injury in question as 7 July 1997. Plaintiff's claim was timely filed and defendant was given notice within a reasonable time after plaintiff was advised of the probable work-relatedness of his claim by competent medical authority. Although this was the first notice that defendant-employer received that plaintiff contended his knee condition was due to his job, defendant knew of plaintiff's knee condition and that he was undergoing surgery for the problem. Defendant has not demonstrated prejudice as a result of plaintiff's failure to file a claim for compensation until 11 May 1999.
14. Dr. Friedrich was of the opinion that plaintiff's job did not cause the development of his osteoarthritis, nor did it contribute to the development of plaintiff's osteoarthritis. However, when presented with a hypothetical which assumed that plaintiff had to "repeatedly squat at his knees" and "spend considerable portions of his workday on his knees on concrete," and that plaintiff would "often have to climb stairs . . . up to eight to ten flights" and "was often required to climb ladders while carrying the drilling equipment," Dr. Friedrich opined that plaintiff's employment more likely than not significantly contributed to the aggravation and acceleration of plaintiff's osteoarthritis and exposed plaintiff to an increased risk as compared to the general public of suffering both a significant aggravation and a significant acceleration of his condition. Furthermore, Dr. Friedrich opined that plaintiff's employment hastened the onset of his disabling condition and that plaintiff's symptoms necessitated the surgery which was performed on plaintiff's knees. Dr. Friedrich also stated that everyday activities such as getting in and out of chairs, walking or standing in his own home, and going up and down stairs could also have aggravated plaintiff's condition, that any use of a joint with osteoarthritis would aggravate and accelerate the symptoms, and that he believed plaintiff would have eventually needed surgery regardless of the nature of his employment; however, he further opined that the strenuous nature of plaintiff's job duties would aggravate his knee condition more than the use of the joint in everyday activities.
15. There is no evidence that plaintiff's employment duties caused any additional permanent impairment to plaintiff's knees. The medical testimony offered by Dr. Friedrich, the only medical expert to testify in this case, indicates that the strenuousness of plaintiff's employment duties and activities of everyday living more likely than not increased the level of pain that plaintiff suffered as a result of his pre-existing, non-disabling, non-occupational disease, and the increase in plaintiff's level of pain caused his incapacity to work and hastened his need for surgery. While the undersigned acknowledge that plaintiff's job increased the pain in his knees more than everyday activities, the evidence also establishes that plaintiff's pain level due to his osteoarthritis would likely have increased to the point where surgery and disablement would have resulted without the workplace aggravation.
16. There was no expert opinion testimony offered by Dr. Friedrich that plaintiff's job duties changed the nature of his osteoarthritis. The only effect plaintiff's employment had on his condition was to increase his symptomology, and this alone does not constitute an occupational disease. If plaintiff had experienced the same level of disabling pain in his knees due to the work-related stress without having the pre-existing osteoarthritis, his pain alone would not be compensable as an occupational disease. Based on the greater weight of the medical evidence, plaintiff's job duties aggravated his symptoms, but not his underlying disease process.
17. On 24 November 1999, Dr. Friedrich filled out a Statement of Disability form in which he stated that as a result of his knee surgeries plaintiff was totally disabled from his job and from any other work, that he was not a candidate for trial employment in any type of work, and that he did not expect a fundamental or marked change in the future due to plaintiff's inability to stand or sit for long periods of time.
18. As a result of plaintiff's knee replacement surgeries and resulting disability, he is unable to return to work at his former employment or any other employment.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission enters the following:
 CONCLUSIONS OF LAW
1. Plaintiff was not informed by his treating physician that his knee condition may have been aggravated or accelerated by his job duties until 12 May 1999. Plaintiff filed a claim for workers' compensation due to an occupational disease on 11 May 1999 after waiting for an opinion from his treating physician for several months. N.C. Gen. Stat. § 97-22.
2. Plaintiff's claim was timely filed within 30 days of his being advised by competent medical authority that his condition was work-related. N.C. Gen. Stat. § 97-22.
3. Plaintiff has provided reasonable excuse for not giving notice of his claim within 30 days and defendant was not prejudiced by plaintiff's failure to notify defendant of his compensation claim within thirty days of the date his disability began. N.C. Gen. Stat. § 97-22.
4. For a disease to be occupational under N.C. Gen. Stat. §97-53(13), it must be (1) characteristic of persons engaged in the particular trade or occupation in which the claimant is engaged; (2) not an ordinary disease of life to which the public generally is equally exposed with those engaged in that particular trade or occupation; and (3) there must be "a causal connection between the disease and the [claimant's] employment." Hansel v. Sherman Textiles, 304 N.C. 44, 52,283 S.E.2d 101, 105-06 (1981). In order to satisfy the first two elements the disease need not originate exclusively from or be unique to the particular trade or occupation in question. All ordinary diseases of life are not excluded from the statute's coverage. Only such ordinary diseases of life to which the general public is exposed equally with workers in the particular trade or occupation are excluded. Booker v.Duke Medical Center, 297 N.C. 458, 472-75, 256 S.E.2d 189, 198-200
(1979).
5. It has been held that when a pre-existing, non-disabling, non-job-related disease is "aggravated or accelerated by causes and conditions characteristic of and peculiar to claimant's employment" so that disability results, the employee must be compensated under the Act.Walston v. Burlington Industries, 304 N.C. 670, 285 S.E.2d 822, as amended, 305 N.C. 296, 297, 285 S.E.2d 822, 823 (1982). Through the testimony of Dr. Friedrich and other evidence of record, plaintiff has established that the stress placed on his knees due to the strenuous nature of his job duties and not the repetitiveness of the job accelerated his pre-existing osteoarthritis by increasing his pain symptoms. Plaintiff's pain symptoms in turn hastened the onset of his need for surgery. However, plaintiff has not established that his job duties aggravated or accelerated the underlying osteoarthritis disease process. Plaintiff's everyday activities also caused an increase in his pain symptoms. Further, if plaintiff had experienced the same level of disabling pain in his knees due to the work-related stress without having the pre-existing osteoarthritis, his pain alone would not be compensable as an occupational disease. The greater weight of the medical evidence shows that plaintiff's job duties aggravated his symptoms but not his underlying disease process, and plaintiff's pain symptoms alone do not constitute an occupational disease. Accordingly, plaintiff's non-disabling, non-occupational disease of osteoarthritis has not been shown to have been aggravated or accelerated by causes and conditions peculiar to his employment; therefore, the resulting disability is not compensable under the Act. Id.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 ORDER
1. Under the law, plaintiff's claim must be, and the same is hereby, DENIED.
2. Each side shall bear its own costs.
This the ___ day of August, 2001.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/_______________ LAURA K. MAVRETIC COMMISSIONER
DISSENTING:
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER